Good morning, Your Honors. My name is Nicholas Brawney. I'm the Solicitor General of Arkansas and I'm here on behalf of the Appellant Defendants. Mr. Brawney, could you get the mic a little closer and speak up just a little bit so we can hear you clearly? Is that better, Your Honor? Yes, that's better. May it please the Court. This is a case about a district court ignoring precedent. The district court ignored the standard for determining an undue burden. The district court ignored a large fraction test. The district court ignored the Supreme Court's conclusion that particularly barbaric abortion practices cause psychological harm. And the district court did all of that to ignore the brutality of killing an unborn child on the very eve of viability by ripping its limbs off, tearing open its abdomen and thorax, and crushing its skull. The district court determined that the four common sense abortion regulations at issue here likely imposed an undue burden because it did not believe they were more beneficial than burdensome and because they might cause some patients to delay or forego. But that neither describes the undue burden standard nor the facial relief standard. Rather, an abortion regulation imposes an undue burden where it is substantially more burdensome than beneficial. Indeed, as this court explained in Planned Parenthood v. Jegley, only that standard reflects Hellerstedt's conclusion that the laws at issue in that case were unconstitutional because their numerous burdens substantially outweighed their minor or nonexistent benefits. And the Fifth Circuit reached the same conclusion in June Medical v. Gee. But despite that, the phrase substantially outweighs appears just once in the district court's entire 143-page opinion. And how often does it appear in the Supreme Court's decisions?  It does, only in the sense that the Supreme Court describes the weighing that was done, for instance, in Whole Woman's Health v. Hellerstedt. Would you take issue with the argument that the state is trying to interject a substantial requirement that's not in the U.S. Supreme Court's decisions? I disagree with that, Your Honor. I think in Planned Parenthood v. Jegley, this court explained that that standard— Absolutely, Your Honor. And I think, again, what this court was explaining in Planned Parenthood v. Jegley was that that is the standard that the Supreme Court applied. That describes the quantum of proof, in other words, to describe an undue burden. So the word substantially is in all of the Supreme Court's decisions? I believe that's the standard that they're— Well, do you believe it or is it? It's the standard that the court was expressing. In other words, you've cited page references where the Supreme Court has used that term? This court has described the Supreme Court's conclusions requiring that. And the Fifth Circuit also has described the Supreme Court's conclusion as requiring that. But despite that being— What about the exceptional and truly significant burdens that you talk about? I think that describes what the Supreme Court concluded the standard actually is. I think, Your Honor— Has this court ever used those terms? I don't know that it's used those exact words. In other words, you're imposing your Arkansas version of what the Supreme Court should have said. I disagree with that, Your Honor. Pardon? We are using the description that this court used in Planned Parenthood v. Jegley to describe what whole women's health v. Hellerstedt held, which is you have substantial, great, numerous burdens, and you balance those against nonexistent benefits in that case. And the Supreme Court said that's what the balance was in that case, and that's why it imposed an undue burden. Again, the Fifth Circuit has also reached the same conclusion. Well, what do we care about the Sixth Circuit? It's the Supreme Court that governs our decision in this case. And prior decisions by this court, including Planned Parenthood v. Jegley, which have said that's the standard that ought to be applied to describe the quantum of proof required to show substantially outweighing. So despite that being—and I actually should add, Your Honor, it's not just—we're not just arguing that that standard applies. We're actually arguing that the district court really didn't do any balancing here. Arkansas wins this case, whether or not that's the standard. I think a review of the laws at issue here clearly shows that the burdens here do not outweigh at all the benefits of the laws at issue, and I don't think the district court actually did any balancing in this case. And I think that's very clear that if you look at—let's take, for instance, the dismemberment ban, Your Honors. If we examine what the district court did, and we can talk about the sort of benefits analysis in a little bit more detail in a moment, but the district court on the benefits side largely ignored Arkansas's—the benefits of Arkansas's law, mainly promoting respect for life and protecting medical ethics. And then on the burdens side in particular, it really ignored and failed to conduct any burdens analysis whatsoever from which to connect the weight. So what the district court— In other words, the district court didn't even consider whether this was a burden? I believe the district court failed to actually consider what the burdens were. I think what the district court did is—let's take DeJoxin, for instance, Your Honor. In the case of DeJoxin, the district court merely concluded that DeJoxin has some risk for patients at large, those risks being things like spontaneous— In other words, basically you're disagreeing with the district court's findings. No, Your Honor. I'm disagreeing— In other words, you accept the district court's findings and facts in total? No, Your Honor. But I don't think that's— Well, which ones do you disagree with? For instance, the finding that DeJoxin is an unfeasible means of accomplishing pre-dismemberment demise. The record clearly establishes that Hopkins currently uses DeJoxin to cause pre-dismemberment demise. And that's probably the best evidence that the district court's— or best factual evidence that the district court's factual conclusion on that point is simply wrong, is Hopkins actually does it now. So he can't really turn around now and suddenly argue, well, I can't use it, when he's already made the decision that it's feasible, that it's safe for his patients, that it does not present significant risk for his patients, and that it can be safely used to accomplish demise. But going back to the point I was making earlier, what I think actually happened here is when the district court tried to look at the burdens, the district court merely asserted that there are generalized health risks that accompany any medical procedure. The district court said that, and that's correct. Any medical procedure is going to include health risks. But the district court really did not do an analysis of what are the risks of DeJoxin. Instead, it asserted there are the general risks, things like infection from a needle, which is true any time somebody goes to undergo a medical procedure, things like spontaneous abortion. Those are things that exist now, and Hopkins still has decided he's going to use DeJoxin beginning at 18 weeks. So he's already made the decision that those aren't significant risks. The district court took those generalized risks that apply to a very small subset of patients across the board and then added into them the unique risks that patients with unique medical conditions face. So, for instance, patients with cardiac conditions cannot generally receive DeJoxin. It would present greater risk. The district court never made any effort, Your Honors, to determine how many patients have those risks. In other words, it just said some. And it said some of these and this generalized risk, and it came to a conclusion that some women would face increased risk. It basically did the same thing the exact same district court did in Jigley and just asserted that that some alone somehow was risk. But you can't, without quantifying the risk, without determining whether that cardiac condition, for instance, applies to one woman or applies to a large number of women, you simply can't figure out what the risks are that you're balancing. And this was a facial challenge, was it not? That's right, Your Honor. And on a facial challenge, the district court needs to show that a large fraction of patients would actually be burdened. So our argument on that point, Your Honors, is that the district court, even if you rejected the substantially outweighed language from Jigley, our argument is the district court simply didn't do any balancing here because it didn't figure out what it was balancing. So what do we do, send it back for yet another fact-finding determination? No, Your Honor, I don't think that's necessary. I think this court can look at the record and see what was produced and the district court's conclusions. We'll make findings on the first instance on appeal. They're not findings in the first instance, Your Honor, because the district court only found that some women would face those greater risks and some women, as this court determined in Jigley and the United States Supreme Court said in Casey, is not sufficient to support facial relief. There's no case out there that holds that some women is sufficient for facial relief. Indeed, the Fifth and Sixth Circuits have actually specifically held that an abortion regulation only imposes a burden on a large fraction of patients where practically all women would face that burden. And that's the standard that best reflects the Supreme Court's general jurisprudence with respect to what you need to bring on a facial challenge. In other words, if some women is enough, we've lowered the standard so much that it basically blurs the distinction between a facial challenge and an as-applied challenge. And going back to the facial challenge point, part of the relevant point here is they could bring an as-applied challenge. If there are a subset of women who face these unique risks, they could have brought it as an as-applied challenge. And that's what Justice Kennedy said in Gonzales, is that if there are unique risks that are applicable to a unique subset of patients, Your Honors, that's what an as-applied challenge is for. We can then balance those unique risks or those unique burdens against what the benefits of the law are. And that would be the more appropriate route to go. So what I'll do now, I guess, since we sort of talked about the fact that this is a facial challenge, and because the district court, not only in the dismemberment ban, but on each of the individual laws here, basically resorted to declaring that some women would face unique burdens or some women might forego or delay, and that's not a justification for a facial challenge. What I'll do now is I'll go through the individual laws here and talk about some of the other. Your Honor was asking about some of the factual errors. I'll go through sort of the laws in detail to talk about the other fundamental errors in the district court's analysis. So the first law at issue here prohibits killing an unborn child on the very eve of viability by tearing its limbs off so that it slowly bleeds to death. The law at issue here only bans that distinctively disturbing method of killing. It does not prohibit Hopkins from performing second trimester abortions, nor does it prohibit Hopkins from performing dismemberment after inducing fetal demise. Now, in analyzing that, as I mentioned earlier, the district court did not, or it acknowledged Arkansas' interest and recognized that Arkansas' interest was in promoting respect for life and safeguarding medical ethics. But nevertheless, having said that, in just three passing lines that were largely dedicated to criticizing the legislative process, three lines that talked about Arkansas' interest, Your Honors, in a 143-page opinion, the district court then proceeded to demean those interests by declaring that Arkansas had simply banned a medical procedure where, quote, fetal tissue generally comes apart. That's not a descriptive of Arkansas' interest here. But in addition to that, the district court largely ignored those interests, and instead, in its benefits analysis, it opted to focus on what the district court deemed the ban's lack of health benefits. In so doing, the district court simply disregarded Casey's central premise that states may enact legislation respecting life and promoting medical ethics, even if that legislation does not provide a health benefit. In other words, Casey doesn't distinguish between those interests. Those interests are equal. And the district court couldn't just give a three-line passing assertion to those interests. It had to actually examine them and weigh them, and it simply did not do that here. And even with respect to health benefits, the district court ignored Gonzales' holding that states have a significant interest in protecting women from the severe depression and mental anguish associated with particularly barbaric abortion practices. That's what the Supreme Court has said is one of the interests that has to be considered. And the district court simply refused to do that. It declared the opposite. It said, I'm not going to consider any evidence at that point. And that means that the district court simply didn't conduct any weighing analysis at all because it simply did away with those interests. In other words, what should the district court have done with respect to this argument? It should have actually considered those interests. I think when you're actually conducting the weighing, Your Honor, you would have to determine whether the burdens that are alleged here on, again, a subset of some women, you have to consider Arkansas' unique interest in banning a particularly barbaric abortion practice and whether it does so actually, for instance, on the health side, has health benefits. And again, the Supreme Court has said that banning a particularly barbaric abortion practice protects women from psychological harm. In addition to that, there's evidence in the record. This is one of the factual disagreements with the district court. There's evidence. Has any other circuit faced and upheld a challenge to a D&E procedure mandate like we have in this case? Dismemberment bans, the Fifth Circuit has heard an argument on a very similar ban. There's no decision yet in that case, Your Honor. The Eleventh Circuit issued an opinion relatively recently that I know opposing counsel highlighted in a 28-J letter and we also mentioned. And I'm happy, if Your Honor would like, to sort of talk about the differences between this case and that Eleventh Circuit case. How is this case so much different or any different from the Eleventh Circuit decision? It's substantially different, Your Honor. The record in that case is very, very different from the record in this case. But that having been said, I think there are two fundamental differences between that case and this one. One is legal and one is factual. One is legal and one is factual, Your Honor. So on the legal side, that case was an as-applied challenge. This is a factual or a facial challenge. And as a consequence of that, the Eleventh Circuit did not need to wrestle with the issue that's so important here, which is whether or not a large fraction of women would be required to forego or delay an abortion. Instead, because that was an as-applied challenge, the Eleventh Circuit simply didn't have to conduct that analysis on the large fraction inquiry. And that's also important, the fact that that was an as-applied challenge, because as the Eleventh Circuit actually explains, in the context of an as-applied challenge, unlike a facial challenge, in a facial challenge, evidence of medical uncertainty, that is, disagreement about the availability of a particular procedure or documented disagreements or assertions that particular procedures aren't available as alternatives, that's not a basis for facial relief on a facial challenge. And the Eleventh Circuit emphasized that made a difference in that case. By contrast, this is a facial challenge. And all they've asserted is medical uncertainty, or at best they don't know whether a particular demise procedure will accomplish, actually accomplish pre-dismemberment demise. By contrast, you know, it's our position, Your Honor, is that there's evidence in the record that shows that it can be. Digoxin, for instance, Hopkins routinely uses now to accomplish demise. So that evidence of medical uncertainty is another reason why this case comes out differently. And isn't the precedent in the Eleventh Circuit on medical uncertainty and legislative discretion different than in the Eighth Circuit? It is, Your Honor. In fact, in Planned Parenthood v. Jegley, this Court said that Whole Woman's Health v. Hellerstedt was very careful to preserve the medical uncertainty language from Gonzales. So this Court has already addressed that issue as well. And the medical uncertainty here is again what? Well, we don't believe that there is any medical uncertainty, Your Honor. So, again, taking digoxin as an example of a pre-dismemberment methodology, there's direct testimony in the record that Hopkins currently uses digoxin to accomplish demise beginning at 18 weeks. And there's direct testimony in the record that prior to 18 weeks, it would also accomplish demise without markedly different side effects. So we don't believe that there's any medical uncertainty. They've asserted in response essentially that Hopkins alleges he doesn't know whether digoxin will work prior to 18 weeks. So at best, he's asserting medical uncertainty. And if you believe or go with the district court's conclusion. What was the testimony of the doctors as far as whether they would be willing to jeopardize their status proceeding under the new regime? What did the district court find? Did she find that the effect of these three restrictions, I guess it was three, means that these doctors will no longer perform these abortions? I think, Your Honor, what the district court found is that Dr. Hopkins and Dr. Hopkins alone because only he's sued here and only he offered. In other words, there will be other people standing in the wings being. Is there any testimony that abortions would be performed by anybody in Arkansas in the face of these statutes? I honestly don't believe that there's any testimony either way. And the reason I say that, Your Honor, is so the district court found pursuant to Hopkins' representations that there would be no more second trimester abortions because he wouldn't proceed with these alternative demise procedures. However, Hopkins is not. The district court found this. Hopkins is neither Arkansas' only second trimester abortion practitioner. He's not even Little Rock Family Planning's only second trimester abortion practitioner. And those other doctors at Little Rock Family Planning who perform second trimester abortions, they haven't sued. And, therefore, if there are other doctors, there's no undue burden and that's the end of the case from the state's point of view. Yes, Your Honor, that's one of the arguments. Well, we'll see what your opponents say about that. Going back to the distinctions on the 11th Circuit really quickly, the factual difference, Your Honors, is that in that case, the doctors who had brought the as-applied challenge did not regularly use digoxin. That meant that they could claim that they didn't know how to use it, they were unfamiliar with it, they couldn't testify as to whether it would work or not. By contrast here, it's unequivocal that Hopkins regularly uses digoxin to accomplish fetal demise and that because he regularly uses it, he simply can't make that kind of an argument that was so relevant in the 11th Circuit case. So on the burden side of the analysis, I know we talked a little bit about the benefits. On the burden side, in addition to simply asserting that because Dr. Hopkins represents, he will not continue performing these procedures, second trimester abortions would be unavailable, the district court also suggested that because no single demise methodology might be appropriate or successful for every patient every time, that meant that predismemberment demise was never feasible. That all-or-nothing shortcut, Your Honors, is simply nonsense. The fact that digoxin might not be available for a particular patient or might not be successful for a particular patient does not establish that it's completely unavailable or if it presents... Because there are the alternative methods. There are alternative methods. You skip the umbilical cord, which is always available under your theory. That's correct, Your Honor. And potassium chloride under our theory is also always available. And we would argue that digoxin, which has a documented failure rate that the district court determined was at most 5% to 10%. But doesn't potassium chloride raise a health risk for the mother, injecting essentially a poison into the woman's... So potassium chloride, Your Honor, the testimony in the record here, and it's Dr. Biggio's testimony, is that the dose of potassium chloride we're talking about here is not the same as most of us would think of when you're injecting somebody with potassium chloride. It's not a dose that in the abstract presents any health risk to the mother unless the person performing that injection hit somewhere entirely different than where they were aiming. In other words, the person performing the injection would actually have to hit a maternal blood vessel, and that's extremely unlikely. The district court essentially declared that you would need an incompetent provider in order to miss like that. And that's not a reason for rejecting it out of hand. Any medical procedure conducted by an incompetent medical provider, including a D&E, Kermit Gosnell being the perfect example of an incompetent medical provider... So we believe that there's testimony in the record, Your Honor, that any doctor who has experience performing an amniocentesis, which is something all OBGYNs know how to do, could perform these injections. There's also some... The district court also recognized that hospitals do perform these procedures. Hospitals right now are the only ones that perform them, but that's partially because there's no incentive for anybody else to perform them. There's also testimony in the record from Dr. Biggio about Washington University in St. Louis, which conducted D&E abortions in a hospital setting, but actually performed the potassium chloride injections in an outpatient setting. So it's simply not true that these injections cannot be performed in an outpatient setting, or that Hopkins, or one of the other practitioners who we have no testimony from at Little Rock Family Planning could acquire those skills. The district court simply didn't address what those other doctors could do. There was no testimony from them, and they didn't bring this lawsuit. In other words, the district court didn't do a thorough enough job of examining the evidence before it? I think it's... That's a nice way to put it, Your Honor. I think the district court simply decided to ignore the evidence in front of it. I think that's the more fair characterization of what happened here. Another... Your Honor sort of hit on this. Part of the district court's conclusion here was that in the case of Dijoxin, if it didn't work 100% of the time, that Dr. Hopkins was simply not going to use it. There's some representations from Dr. Hopkins that because if a Dijoxin injection didn't work in that 5% to 10% of cases where it might fail, and actually we would argue that the record demonstrates that it's really more like 2% in the hands of a skilled provider who regularly uses it, like Dr. Hopkins. But in the case where it might fail, Dr. Hopkins alleges, and the district court essentially concluded, that he simply would do nothing else, and that would amount to patient abandonment. That's simply not true. Again, like any other medical procedure, in that very tiny fraction of failures where we're talking about, the patient would have to undergo another procedure, which might be an umbilical cord transection, which any OBGYN can do. In other words, the State's argument is as long as only a few women are subjected to this risk, no harm, no fault. No, Your Honor, that's not our position. Our position is this is a facial challenge. And because this is a facial challenge as opposed to an as-applied challenge, in the context of a facial challenge, he has to demonstrate that a large fraction of relevant patients would have to forego or delay. And the district court didn't find that a large fraction would. It simply declared that because Hopkins wouldn't perform these injections, 100% of women would have to forego. It didn't talk about whether Hopkins patients even represent a large fraction of patients, because, of course, there are other Little Rock family planning practitioners, as the district court found, and said it just asserted because Hopkins wouldn't do it, that they wouldn't occur and 100% of patients would be burned. That's simply not accurate. Counsel, we're at the preliminary injunction phase of the litigation. Would you address the irreparable harm question? It would seem that to keep the status quo, as the district court essentially has done, might be an appropriate thing to do at a preliminary stage, given the potential harms and risks that are in evidence. So what's the state's response to the consideration of irreparable harm? So on this issue, Your Honor, the district court, when sort of weighing the equities and addressing irreparable harm, referred to Arkansas' harm from allowing these procedures to continue as whatever damage the state might face. I don't believe that's a fair characterization to refer to allowing a procedure, again, that involves tearing the limbs off an unborn child so that it slowly bleeds to death as whatever damage. I think that damage of allowing that uniquely barbaric procedure to continue to take place and the societal harms, the medical ethics harms that it causes, and the harms to patients and providers, that's irreparable. Is there evidence that the alternatives that are described, the digoxin, the transection of the umbilical cord and potassium chloride, they seem marginally less barbaric in terms of achieving essentially the same end, the demise of an unborn child? Much like in Gonzales, Your Honor, the legislature has determined that this particular procedure, and there's Supreme Court indications to this effect, that the act of actually ripping a living unborn child to pieces is more a barbaric act than either one of those alternatives. I'm about to enter my rebuttal time unless the Court has any further questions. I'll reserve. Thank you, Mr. Browning.  Good morning, Your Honors, and may it please the Court. Three things are clear. One, constitutional protections for individual rights exist not to protect popular decisions, but to ensure that within a circumscribed sphere, individuals can make decisions even when others disapprove based on deeply, sincerely held moral convictions. Two, binding Supreme Court precedent places the decision whether to continue or terminate a previability pregnancy firmly within that circumscribed sphere. Three, faithfully applying that binding precedent, the district court here issued a scrupulously careful 140-page opinion that, based on findings that are not clearly erroneous, held each of the four challenge laws likely unconstitutional and that each of the other preliminary injunction factors tipped in plaintiff's favor. This Court should affirm the preliminary injunction and reject Arkansas' suggestion that as the price of exercising a constitutional right, Arkansas may force a woman to undergo additional medical procedures that increase her risks and to undergo violations of her confidentiality. This Court should affirm, because anything else would require a finding that the district court's findings were clearly erroneous or that the court abused its broad discretion in granting the injunction the court below did neither. I'd like to start with the D&E ban. Neither the law nor the undisputed facts have changed since the Supreme Court made clear a state cannot ban D&E procedures that occur before fetal demise. In Stenberg v. Carhart, granting facial relief and enjoining in its entirety a law that swept standard D&E within its ban, in reaching that holding, the court acknowledged the separate demise procedures physicians can attempt prior to a D&E starting at 18 to 20 weeks, and still the court held the law facially unconstitutional. The court resoundingly reaffirmed that principle in Gonzales, restating that a ban on standard D&E cannot stand. The Supreme Court upheld the partial birth abortion ban because and only because it did not sweep standard D&E within its reach. The court described standard D&E as the commonly used and generally accepted method, the standard medical option, the usual method. And here's how the court opened its analysis of whether the partial birth abortion ban reached that method. Quote, By too broad, the court meant does it reach standard D&E. In this Arkansas case, the district court correctly found no basis on which to reach a different conclusion. The Arkansas law bans D&E, which accounts for 100% of abortions in Arkansas after 14 weeks. The state's proposed methods of fetal demise do not alleviate the undue burdens. That's what the district court found in pages of careful findings. And those findings are in line with every court to assess the claim that separate demise procedures can save a D&E ban, including the 11th Circuit. Those findings are not clearly as erroneous. The district court found that each of the state's proposed workarounds are risk-enhancing and unfeasible, untested, unsafe, or experimental. Those findings are based on the evidence of two declarations from Dr. Hopkins and his expert, Dr. Nichols, and also from the executive director, advanced practice nurse practitioner of Little Rock Family Planning Services, the only D&E provider in Arkansas. It was also based on what Arkansas submitted, a declaration from an Arkansas doctor, Wyatt, whom the district court found non-credible, and the Alabama declaration of Dr. Biggio. Because Arkansas had submitted a declaration from an Alabama case, plaintiffs submitted the trial testimony from that case so that the court below and this court could see why the Alabama district court found his testimony non-credible. Arkansas has provided no reason why this court should be the first in the nation to reach a contrary conclusion. Doing so would require finding that the district court committed clear errors, factual findings, or abused its discretion. It did neither. With your permission, I'd like to tick through four claims that the state makes, and I'd like to go into the first and the fourth, but, of course, answer any questions you have. I'd like to just tick through these. Arkansas says that three things save the ban, and then it has one more claim. Arkansas claims that these demise workarounds, these separate additional risk-enhancing procedures save the ban. Arkansas claims that the medical emergency exception saves the ban. It's called a health exception, but that is medical emergency language and has always been interpreted that way. And, finally, Arkansas claims that the CNTER requirements save this ban. None of those are true. Arkansas also asserts that purported medical uncertainty precludes the facial challenge and facial relief here. That assertion likewise fails. So I'd like to focus on the demise workarounds and then that medical uncertainty question, but, of course, we'll answer any questions about the medical emergency exception and the CNTER requirement. So what are the burdens that the D&E ban imposes on women? Well, the district court made well-supported findings that the D&E ban would end abortion care starting at 14 weeks, but, still, let's look at those workaround procedures Arkansas suggests and look at what they would really mean for women's medical well-being. It is undisputed that there is no method of attempting demise that is remotely well-studied before 18 weeks, meaning no studied method at the time when most D&Es take place. Now, when you ask yourself, what is the nature, the burdens, the medical impact of alternatives that a state is saying save a ban, the starting place is the only alternative method the Supreme Court has ever held was sufficient to justify a ban, and that was in Gonzales, where the Supreme Court upheld a ban on partial birth abortion because, and only because, the alternative the government was proposing was standard D&E, standard D&E without demise. For decades, standard D&E has been the widely practiced gold standard for second trimester abortion. The Supreme Court made clear it was the commonly used and generally accepted method, the standard medical option, the usual procedure. There was no dispute in Gonzales, no medical uncertainty whatsoever that that safe harbor alternative was safe. That was undisputed. That's what the Supreme Court found sufficient as an alternative in Gonzales to justify a ban on a rarely used procedure. There's simply no comparison with what the Supreme Court held was sufficient as an alternative to a ban procedure and what Arkansas is proposing here. So let's just go through the digoxin. Of the patchwork of additional procedure Arkansas insists women undergo, the only well-studied one is a single digoxin injection starting at 18 weeks. That's later in pregnancy than most D&Es occur. It is undisputed that well over 60% of D&Es in Arkansas occur before 18 weeks when there is no studied procedure. There is no record evidence of any doctor attempting digoxin before 18 weeks. I thought there was a study in the record that began at 17 weeks. There is one study that refers to procedures from 17 to 24 weeks, and it is unclear how many of those procedures were at 17 weeks. So it's not true that it's only at 18 weeks? Your Honor, it is undisputed, and Dr. Wyatt and Dr. Biggio, on whom Arkansas relies, admitted it is unstudied before 18 weeks. For example, it is also undisputed that injections have limitations based on gestational age. That's Arkansas' expert Dr. Wyatt's testimony, the appendix at page 335. And by limits based on gestation, he means it's not done before 18 weeks. It's not studied. There's no evidence. It's safe. Doctors can't even get informed consent for it because they don't know what the failure rate is. They don't know what the risks and benefits are because it's completely unstudied. He also said there are limitations on injections based on anatomy in that same page. In other words, there are women in whom you can't do it. That is undisputed. It is undisputed that it brings risks. In the Alabama declaration from Dr. Biggio that Arkansas submitted, Dr. Biggio stated, appendix page 259, if there is a delay between the time of the injection and the abortion, which is always true for digoxin, that's undisputed. You've got to wait 24 hours. So when there's that delay, there is approximately a 5% to 10% risk of spontaneous onset of labor, rupture of the membranes, or development of intrauterine infection. Counsel, is there any statistical evidence to indicate the frequency or the relative number of times these complications would occur? Well, there's Dr. Biggio's testimony that there's a 5% to 10% risk if one of those things happens, spontaneous onset of labor, meaning the woman goes into labor and delivers outside a clinical setting, or rupture of the membranes, or development of an intrauterine infection. It is also undisputed that digoxin simply fails in 5% to 10% of cases, meaning 1% to 2% out of every 20 patients, and that a doctor has no way, when beginning a procedure, to know whether it will fail in a given patient. So experts at all parties cited agree digoxin injections carry risks and are contraindicated in some patients and are simply would be experimental before 18 weeks when most D&Es occur. Let's look briefly at potassium chloride. As the Alabama expert Arkansas relies on, Dr. Biggio admitted, and the district court found, potassium chloride injection into the fetal heart is a rare and extremely high-level hospital procedure, requiring advanced subspecialty training beyond an OBGYN residency. That subspecialty is called maternal fetal medicine. As with digoxin, it's undisputed that it's extremely dangerous without that high level of training. As the district court found, there is, quote, no credible dispute about the level of training required for potassium chloride. That's the opinion at 51. And there is no law to support that Arkansas can require doctors to undertake years of subspecialty training in maternal fetal medicine to provide abortions. Furthermore, the district court found it's undisputed that Arkansas hospitals allow abortion only in the rarest of circumstances, and Arkansas offered no counter evidence. Arkansas does not really contest that potassium chloride is unavailable in Arkansas. In their reply brief, they say it's unlikely to be the primary method of ensuring demise. It's not likely to be a method at all. Let's look briefly at cord transection, trying to locate, grasp, and transect the umbilical cord. It's undisputed that's an invasive procedure that is practically unstudied. The district court found the single study of cord transection that exists supports no conclusions about safety and involved no procedures before 16 weeks. That's the decision at page 15. It's undisputed that it subjects women to an increased risk of hemorrhage, perforation, and infection. And as the district court found, no physician to which either party cites would require cord transection in their practice. Biggio admitted that he would not. That's the decision at page 16. As the district court here noted, the trial court that heard Dr. Biggio's testimony in Alabama found his opinion on cord transection was, quote, largely theoretical and not based on experience. It's also undisputed, Your Honor, that in order to access the cord to try to locate it, the physician has to rupture the membranes,  and at that point, fetal tissue can block the cervix. That is undisputed. It's not in our brief. It's on page 15 of the preliminary injunction decision. At that point, it's undisputed. It would be extremely difficult and risky to try to get around the fetus to locate the cord, and indeed doing it would be the very conduct that this ban targets. These purported workarounds — Counsel, isn't that where the scienter requirement comes into play? I respectfully disagree, Your Honor. So there's a couple of things here. First of all, the testimony in this case is that it is impossible using instruments to distinguish between the cord and fetal tissue. Remember, the amniotic fluid is gone. The uterus is cramping down. It's really impossible to ensure that in grasping the cord or trying to locate the cord, you don't grasp fetal tissue instead of or in addition to the cord. This is not a sort of freak accident. This is the natural and probable expected outcome of trying to locate the cord. That's not in dispute. Criminal law presumes that people intend the natural and probable consequences of their actions. That's true in Arkansas, too, and as if that weren't enough, the definition of purposeful in this statute is quite instructive. The law bans purposely engaging in the banned conduct, and it defines purposely if the element involves the attendant's circumstances, the actor is aware of the existence of such circumstances or the actor believes or hopes such circumstances exist. Doctors know very well that this is a likely outcome of trying to grasp the cord. So this is quite unlike the Sientra situation in the federal partial birth abortion ban, which had extremely specific intent requirements for an extremely specific and rare outcome. And the court said, if you don't intend that outcome from the outset, you cannot face criminal liability. That's clearly not true here, because if it were true, when a physician does a didoxin injection and it fails, the physician would have demonstrated intent not to engage in the banned conduct, that is, removing the fetus before demise. But we know that's not Arkansas' position, because Arkansas insists that when didoxin fails, a physician can try a completely unstudied second injection or attempt to cut the cord. So respectfully, Your Honor, I do not think the Sientra requirement here saves this ban. So these purported workarounds violate the principle stated in Stenberg, 530 U.S. at 931, a state may promote but not endanger a woman's health when it regulates the methods of abortion. That's exactly what Arkansas would be doing here. So I would like to turn to the question of medical uncertainty, but I'm ready to answer questions about the medical exception. I think we talked about Sientra. So there are three reasons why the state's medical disagreement argument changes nothing. I'm going to tick through them, and I would like to go back. First of all, there is no medical disagreement on the relevant question. Do these demise workarounds impose medical risks on women? There's no disagreement about that. Two, even if there were disagreement, Whole Women's Health makes clear that that is not a free pass to legislate away abortion access. The court said, quote, legislatures and not courts must resolve questions of medical uncertainty. And it noted, quote, that courts retain an independent constitutional duty to review factual findings where constitutional rights are at stake. Three, even if there were disagreement, that disagreement is wholly different than the medical disagreement in Gonzalez and the 11th Circuit is instructive on this. There was no disagreement in Gonzalez that the standard procedure was available as the alternative safe harbor for every patient. At 550 U.S. at 164, the Supreme Court pointed to the three district courts that had examined the federal partial birth abortion ban. That was a uniform finding. It quoted the Southern District of New York that said experts testifying for both sides agreed D&E was safe. So it was only when determining that that ban left standard D&E without demise available and only when assuring that all sides agreed that was safe that the Supreme Court then went on to the question about which there was medical uncertainty. That question was whether the lack of a health exception condemned an otherwise constitutional underlying ban. The Supreme Court had already found this ban is constitutional only because it leaves the common usual method that is uniformly found to be safe. It leaves that in place. Therefore, the underlying ban is constitutional. Now, do we need to strike this ban because it lacks a health exception? And in that regard, the Supreme Court was looking at a small subset of women who would have used a health exception had it existed. And as to that question, whether the lack of health exception imposed medical harm on that subset of women, on that question, there's medical uncertainty. And it was as to that question the Supreme Court said, you know what? As to that subset of women, you can come back with a pre-enforcement as applied challenge as to women with certain conditions if you think they will suffer medical harm for the lack of a health exception. That is entirely different from the medical uncertainty that Arkansas says exists here. First of all, they've banned the usual method. They've banned the usual method, the safe, uniformly trusted method that everyone agrees is safe for all patients. The medical disagreement here is about whether fetal demise techniques, or excuse me, there is no medical uncertainty here. There is no medical uncertainty. It's uniformly agreed these additional procedures bring risks are untested, experimental, and so forth. Well, what about the state's argument that the district court failed to do any balancing, failed to take into account the number of women who might be adversely affected? I suppose you've addressed this all in your very carefully pre-prepared response, but maybe you would address what the state actually argued this morning. Well, Your Honor, the court did have a balance. How many people are affected by this? Has the Supreme Court said that you've got to show a certain fractional on a... Also, because this is a facial challenge, how does that change our review of the case? So, Your Honor, the Supreme Court has never wavered from the halting that banning the usual, customary standard of care method in the second trimester is unconstitutional facially. That was true in Danforth. That was true in Stenberg. That was true in Gonzales. So I think the notion that this is a facial, that the facial nature of this challenge precludes relief is simply wrong. Let me talk for a minute about the 11th Circuit. Relief there was granted as to 100% of women seeking D&E. The issue was that the court limited relief to the physicians before the court who were 100% of D&E providers, and the court said, yeah, if another provider comes on board, they can come back to me. Now, that is simply not, you know, the universal rule. Think about Casey, where the Supreme Court struck a spousal notice mandate on its face. There are doctors practicing now in Pennsylvania whose patients do not have to, you know, give spousal notification for abortion, and those doctors were in kindergarten when Casey was decided. It is simply not the case that somebody seeking relief for himself and for other doctors, including those who come in later, is precluded from getting relief. But the important point is that in the 11th Circuit case in Alabama, 100% of women were protected. That is clear. Again, I'll interrupt by saying you've covered this, I'm sure, in your prepared remarks, but specifically, how do you address the state's argument that the district court decided to ignore the evidence before? I respectfully disagree with that argument, Your Honor. Okay. So, Arkansas is displeased that the district court noted that for three of the laws, there were no legislative findings. And so the district court said, you know, we assume these state interests to be legitimate. She was quoting Whole Woman's Health. That's exactly what the Supreme Court said in Whole Woman's Health. There were no factual findings, and so the Supreme Court assumed that the interests were legitimate. And she did. What she found in her careful, you know, I have sites for the numerosity findings, I have sites for the balancing, but in summary, she found that there simply was no evidence that the laws furthered a state interest in a constitutionally permissible manner. That's the issue. Sure, there are constitutional ways that Arkansas can, you know, express its preference for childbirth over abortion. There are constitutionally permissible ways for it to promote respect for constitutional rights. Counsel, are you saying that this statute does not further Arkansas' interest in prevented live dismemberment? Well, I think the question is, does it do so in a constitutionally permissible way? It does not. There were no legislative findings here. This, you know, an assertion that Arkansas, you know, prefers one method of demise over another. Let's not forget, Arkansas has a partial birth abortion ban, right? Arkansas has already said, we need to ban this uniquely inhumane procedure. But now comes Arkansas again saying, well, this one's uniquely barbaric. And let me point out that the statute, the D&E ban itself that we've challenged refers to dismemberment by suction. That is in the statute. Comes next year, Arkansas saying, well, that's barbaric too. What they've banned is the commonly used, universally accepted as safe method. There is no state interest that justifies that. And there were no factual findings that this ban would do that. Unless we accept the state's argument that the district court ignored evidence that indicated that there were no insurmountable problems to applying one of the other techniques to cause, to result in fetal demise. Well, but as the district court found, there was no medical disagreement on this question. The fact that the proposed additional demise methods do impose... I assume Mr. Brony will tell us on rebuttal that there is disagreement. I bet he will. With your permission, I'll go on briefly to the other three laws, but we can stay on this one if that's your preference. Don't let me interrupt you anymore. Please go ahead, Your Honor. I'm a visitor here. I want you to interrupt. Okay. So the medical records ban, Plaintiff did not challenge the underlying ban on abortion where the woman's motivated by the sex of the embryo or fetus. He did not challenge the requirement that a doctor say to the woman, do you know the sex of the embryo or fetus? And if she says yes, inform her that if her abortion is motivated by that basis, it's banned in Arkansas. He challenged only the requirement that before doing any abortion, a physician spend reasonable time and effort obtaining the medical records directly related to the woman's entire pregnancy history. Now Arkansas' defense of this law reduces to the assertion that it applies... that the medical records mandate applies only to women who know the sex of the embryo or fetus. Well, that's an improper construction for two reasons. First, you don't construe a statute when the statute is unambiguous. You give it its plain meaning, and this one is plain. There are three separate things that will send a doctor to jail. One is doing an abortion he knows is motivated by the sex of the embryo. A second one is failing to do the colloquy, asking the woman if she knows the sex. And the third one is failing to get those medical records. So it's not ambiguous, it's plain on its face. Second, you don't give a law a saving construction if the saving construction wouldn't save it. And it wouldn't. As the district court found, this medical records mandate would be unconstitutional as applied to 100% of the women for whom it's relevant, whether that's all women getting abortions in Arkansas or only those who know the sex of the embryo or fetus. Counsel, in order for us to conduct the undue burden analysis of the sex selection records statute, don't we have to determine what the state's interest is? Well, this was the law, Your Honor, on which there were legislative findings. This was the only one of the three. And the legislative findings were in preventing abortions where the woman is motivated by the sex of the embryo or fetus. But that's not an issue. Dr. Hopkins didn't challenge the ban. He's only challenged the medical records mandate. How can we balance the interests if we don't know what the interest is? But the interest was stated in the underlying ban and was not challenged, right? But the district court made a not clearly erroneous finding that there was no evidence of how this far-ranging medical record search would actually further the ban. It is undisputed that such a search imposes delay. It's undisputed that it violates confidentiality. It is undisputed that many patients are desperate for their abortion decision not to be known to their other medical providers. And this law is extremely vague. I only have three minutes left and would like to touch briefly on the local disclosure mandate. Dr. Hopkins and his colleagues take their obligation to report any even merely suspected abuse extremely seriously to the well-functioning, robust state hotline with folks with special training in child abuse. This law significantly expands, a 2013 law that applied only to patients 13 and under, and those were patients who tracked the criminal threshold for statutory rape in Arkansas. This new regime applies to all 14- to 16-year-old patients, even those who are married or those having consensual sexual relations with same-age boyfriends. Their intimate conduct gives rise to no suspicion of criminal activity. This is a blanket undifferentiated requirement that applies in all circumstances. You can imagine a 16-year-old married patient in the clinic with her husband being told, yes, well, we're going to have to call up the police department where you live and tell them to come pick up this tissue, and we're going to identify you as the victim and your husband sitting next to you as the suspect. There is no justification for such an undifferentiated dragnet. That is over-inclusive because there's no indication that any reporting is required or any crime has been committed. It's also under-inclusive because it doesn't include miscarriage. The exact same patient can come in for abortion and she'll be subject to that regime. If it turns out that embryonic demise has already occurred and the clinic is providing miscarriage treatment and not abortion, they won't go through that tissue reporting to the local police. It's the same patient. The same state interests have to be at stake. Finally, the tissue disposal mandate. There are constitutionally permissible ways for Arkansas to symbolically represent the value it places on the embryo or fetus, but this isn't it. This law does not dictate any new method of disposal. It does not affect the method of disposal. It requires the doctor on pain of criminal penalties to ensure that who decides the method of disposal is determined in accordance with the Final Disposition Rights Act. The Final Disposition Rights Act applies when someone dies without indicating how they want their body disposed of, and the right to decide goes first to surviving spouse, then surviving children, then surviving parents, then surviving grandparents, and so forth. When more than one person has the right, one person can exercise it when and only when reasonable efforts to locate the other folks who could exercise the right have failed. The state proposes that there's a five-day fix. There is no five-day fix. That is contrary to the language of the Final Disposition Rights Act, which requires efforts to locate others at the same level of right to exercise the right. And if there were a five-day fix, this law would serve absolutely no valid state purpose. There is no state interest in saying, just go ahead and do what you do, but keep the tissue for five days. That serves no valid state purpose. I have lots more to say and would be happy to answer questions, but I see my time is out. Thank you, Ms. Camp. Thank you very much. Mr. Brownlee, your rebuttal. Your Honors, if the essential argument from the other side boiled down is actually an argument that even the district court rejected, and that was because this is the most commonly used form of second trimester abortion. Therefore, the state may never regulate it and may never enact any type of ban that would affect it. Even the district court rejected that argument. The 11th Circuit likewise rejected the argument that merely because a law affects the most commonly used abortion procedure, that does not render that law unconstitutional. So that argument's already been rejected even by the 11th Circuit. It's also important to note that despite all the descriptions here, I didn't hear opposing counsel really describe at any point how the burdens that they're alleging outweigh Arkansas' interest here, nor did I hear any discussion about the standard that the district court articulated in Jigley and that the Fifth Circuit also articulated, reflecting Supreme Court precedent. But going through the turning to dismemberment, going through the three demise methodologies here, the district court, much like opposing counsel's argument, was essentially some of these may not be appropriate for some patients. Some of these might present unique risk for some patients. It was essentially some, some, and some. But as Jigley tells us, and as the U.S. Supreme Court determined in Casey, the mere fact that a law will prevent some patients from having an abortion, like Pennsylvania's parental consent statute, the mere fact that it would keep some patients from having an abortion is not a basis for facial invalidity. So what, how many people must be affected before it becomes a substantial burden to the women as a whole? In order to raise a facial challenge, Your Honor, it would be as the Fifth and Sixth Circuits have explained, practically all women. That's the standard that's consistent with the generalized standard. So as the Fifth Circuit explained... In other words, it has to affect all, otherwise it's not substantial. Practically all, Your Honor. There is a difference between... Well, give us your definition, the mathematical definition of practically all. This Court has said it cannot be boiled down to a mathematical definition, and I think that's right. It's more conceptual than mathematical, as this Court explained in Jigley. You can't hold, in other words, the District Court cannot be held to a mathematical certainty determination. But that's true, but some, it certainly does not meet that standard. Some is not practically all. Some is not a large fraction. I mean, the Supreme Court has made very clear that a law that adversely impacts some is not enough in order to raise facial relief. And that was essentially the conclusion here. With respect to... No, no, that is... Sorry. With respect to digoxin, the risk that Hopkins is alleging would somehow keep him from performing these digoxin injections. He undertakes those digoxin injections now, despite those risks. That means that he's already made a determination that those risks are not significant. And that's what's required in order to allege that this is not an alternative procedure. You would have to show that those risks are significant. In other words, again, this doctor's name was what? Dr. Hopkins, Your Honor. And he said, basically, according to the State's analysis, that he will continue to perform just as he'd been in the past and will not be in any way deterred from doing what he's been doing. I think that's... I think he said he's just not going to perform those injections. And the district court's response to that was what? That he has said he will not continue performing them. That was essentially the district court's analysis, was he simply said that he's not going to continue performing even injections that he performs now after 18 weeks, if this goes into effect. Well, how do we determine the nuances of his testimony? Do we listen to him? Do we bring him up to testify before? I think the district court said that's what he said. The district court said he represented that he would not... So the district court then just flatly misrepresented what the doctor himself said? No, the district court simply failed to acknowledge the fact that he currently performs those injections and decided that because he represents, he will cease performing them. Again, which goes back to your original argument, the district court decided to ignore the evidence before. That's correct, Your Honour, in his own practice. It's a pretty serious allegation. I guess it's up to us to decide whether you're right or whether the district court was right. Well, you also have to determine, Your Honour, whether or not those risks that they're alleging are significant risks, which is the standard from Gonzales. And I think that's a legal question. And that's what, a value judgment or an empirical judgment? It's a legal question, Your Honour. It's a what? It's a legal question whether or not those risks are significant. Well, legal in what sense? An empirical in terms of the numbers or the overall impression of what we think the state did was correct? I think you have to determine whether or not he has shown that those risks that they're alleging, to the extent that they allege they're significant, whether the district court determined that would apply to a large fraction. And if the district court found the other way in contrary to your view, even if we disagree, what do we do? Again, Your Honour, the district court still didn't find that a large fraction of patients here would be required. So it comes down basically to a, not mathematical, but a factual determination of how many people are going to be affected by this? I disagree that it's a factual determination, Your Honour. The question of whether or not there's a large fraction is a legal question. And the district court did only not find that with respect to the dismemberment ban, but all of these laws. Thank you. Thank you, Mr. Browning. Thank you also, Ms. Camp. The court wishes to thank all counsel for your presence in the courtroom today. The argument which you've provided to us in the briefing that has been submitted will take the case under advisement and rendered decision. You may be excused.